John M. Mejía, 13965
  John.Mejia@chrisjen.com
Anna P. Christiansen, 17518
  Anna.Christiansen@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111-2047
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **S. NICHOLE MILLER**,<br><br>Plaintiff,<br><br>v.<br><br>**MAKALONI PRESCOTT,** in his individual capacity,<br><br>Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case No. 2:25-cv-01041 |

Plaintiff S. Nichole Miller ("Plaintiff" or "Ms. Miller"), by and through her undersigned counsel of record, hereby complains against Defendant Makaloni Prescott (Officer Prescott") as alleged below:

### INTRODUCTION

In this action, Ms. Miller seeks accountability from Officer Prescott for seriously injuring her as she carried out her constitutionally protected role of reporting as a journalist at a public protest. Ms. Miller worked for years to bring important stories to the public. Whether covering the Capitol, community events, or protests, Ms. Miller was committed to making sure people across Utah stay informed. On the afternoon of April 29, 2024, Ms. Miller went to the east side of

President's Circle on the University of Utah campus to cover a student-led protest. She wore a press badge and carried professional equipment.

By about 11:00 p.m., law enforcement had used force to dismantle a small encampment that protestors had set up. Law enforcement dressed in riot gear continued to use force to clear the protestors who remained afterwards. At around 11:30 p.m., police activity had moved to the farthest west side of President's Circle, and Ms. Miller had followed the police and protestors to that area. Near one of the entrances on University Avenue, Ms. Miller saw a group of officers arresting a man, with some on top of him. She approached the scene from an appropriate distance to document those events, close enough to record, but far enough not to interfere. Officer Prescott was among that group of officers.

When Office Prescott saw Ms. Miller recording these police activities, he yelled at her to back up. Ms. Miller pointed out that she was a well-identified member of the press and recording the events in that capacity and was not interfering with the officer's actions. She backed up. Her retreat was too slow for Office Prescott. He rushed at her and shoved her to the ground. As she hit the ground, Ms. Miller felt a snap and heard a pop in her surgically repaired knee. Officer Prescott stated she was under arrest and demanded she get up. Ms. Miller told him that she could not comply because he had injured her knee. After Officer Prescot realized that he had seriously hurt Ms. Miller, he simply walked away. He offered her no help or medical attention of any kind. He was not wearing a body-worn camera. He did not record his actions against her in his report of what he had done at the protest that night.

Ms. Miller had done nothing wrong. She was working as a journalist with an identifiable badge. She had the right and the duty to record what Officer Prescott and other officers were doing. Instead of protecting her, Officer Prescott punished her, unlawfully detaining her and violently

shoving her to the ground. Defendants violated Ms. Miller rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution as well as Article I, Sections 9 and 15 of the Utah Constitution.

As a result of Officer Prescott's actions, Ms. Miller suffered and continues to suffer physical and emotional harm. The damage to her knee was serious and will continue into the future. She lives with fear and trauma, especially around the police. Ms. Miller brings this action to stand up for her rights and to hold Officer Prescott accountable. She seeks justice not only for herself, but to protect the constitutional rights of all reporters and the public they serve.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because the claims arise under the First and Fourth Amendments to the U.S. Constitution and are brought pursuant to 42 U.S.C. § 1983.

2.      The Court also has supplemental jurisdiction over Plaintiff's state constitutional claims under 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the Constitution.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in Salt Lake County, Utah.

## PARTIES

4.      Ms. Miller is an individual who, at the time of the events of this Complaint, was a citizen of Utah.

5.      Defendant Makaloni Prescott is an individual who was employed by the Unified Police Department of Greater Salt Lake (the "UPD"). At all times relevant hereto, he was acting

3

in accordance with UPD training and policy.  He was acting under color of state law. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

6.      At all times relevant to this Complaint, Ms. Miller was a professional journalist and reporter for a local media organization.

7.      Ms. Miller was at President's Circle on the University of Utah campus on April 29, 2024.

8.      She was there to cover a large student-led protest taking place at President's Circle on the University of Utah campus (the "U of U Protest").

9.      The U of U Protest began around 4:00 p.m. with speeches on the steps of the John R. Park Building. Media reports estimate that about 300 people were involved in the U of U Protest.

10.      After the speeches, some protestors erected some tents on a grassy area on the northeast lawn of President's Circle as a symbolic political statement. Protestors formed a circle around the tents and participated in peaceful activities, including prayer, song, and speeches.

11.      At about 6:00 p.m., the University of Utah police requested assistance from "public order units" ("POUs") from various agencies in the Salt Lake City area.

12.      Specifically, the University of Utah police asked for help to forcefully clear the small encampment to enforce the university's regulation against overnight camping on campus.

13.      By around 9:00 p.m., law enforcement agents from multiple "Public Order Units" ("POUs") including the West Valley City Police Department, the Salt Lake City Police Department, the Taylorsville Police Department, and the UPD were deployed to President's Circle.

14.      The demonstration had been ongoing for several hours and was characterized by speeches, prayers, songs, and peaceful assembly.

4

15. At approximately 10 p.m., University of Utah campus police announced over bullhorn that the protest was an "unlawful assembly" and ordered participants to leave.

16. Officers from the UPD, including Officer Prescott, donned riot gear at about 10:15 p.m.

17. Because they were not in their typical uniforms, some of the agents, including Officer Prescott, did not have readily visible markings identifying their names or agencies.

18. At around 11:00 p.m., law enforcement used force to enter into the small protest encampment and began physically removing tents.

19. Officers from various agencies gave inconsistent and conflicting instructions to members of the press as the officer dismantled the tents. Sometimes agents told media members to move to one side of officers; other times to move in front; and other times to move behind them.

20. At one point, Ms. Miller heard a law enforcement agent yell, "We don't give a f-k about the press!"

21. By approximately 11:30 p.m., officers had torn down and confiscated the tents, and most protestors had left the area. Enforcing the regulation against overnight camping was the reason the University requested UPD and other agencies deploy their POUs to President's Circle and the encampment was gone. Nonetheless, agents from the POUs proceeded to use force to ensure that no protestors remained in the area of President's Circle.

22. Law enforcement, including Officer Prescott and other UPD officers, followed and engaged with individuals from the protest as those individuals headed west toward University Street at the west end of President's Circle.

23. As part of their constitutionally protected function as the press, Ms. Miller and other media members documented law enforcement's actions during these events.

24.     At about 11:30 p.m., Ms. Miller had followed law enforcement and protestors to the western end of President's Circle, near the "University of Utah" sign on University Street.

25.     There, Ms. Miller witnessed several law enforcement agents in riot gear using force against a man who was lying on the ground.

26.     Ms. Miller approached the scene at a safe and non-intrusive distance and attempted to begin recording with her cell phone. She also had a professional-grade camera that she did not use at that moment.

27.     Although Ms. Miller later learned that the recording did not save, it was objectively clear that she was there intending to document the officers' conduct as part of her job.

28.     Officer Prescott was among the law enforcement agents near the man.

29.     Officer Prescott saw that Ms. Miller was trying to record the officer's arrest of the man.

30.     Officer Prescott told Ms. Miller to, "Back up."

31.     At the time of that demand, Ms. Miller was not interfering with Officer Prescott or any other officer's activities in any way.

32.     Ms. Miller was standing at a reasonable distance and engaged in protected newsgathering activity and was not interfering in police's activities.

33.     Ms. Miller wore a lanyard with a badge identifying her as a member of the press and carried a professional camera. Officer Prescott could see that she was a member of the press.

34.     Ms. Miller's right to observe and document police actions in public was well established at the time of these events. *See, e.g.*, *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022).

35.    In response to Officer Prescott's words, Ms. Miller raised her hands and began to step backward. As she moved, she stated aloud that she was complying and that she was a member of the press recording from an appropriate distance.

36.    Despite her compliance, Officer Prescott continued to approach Ms. Miller in an aggressive and threatening manner, continuing to tell her to "back up."

37.    Officer Prescott quickly closed the distance between him and Ms. Miller while continuing to tell her to back up.

38.    Without provocation or warning, Officer Prescott shoved Ms. Miller in the upper chest.

39.    Ms. Miller fell backward and hit the concrete sidewalk hard.

40.    As Ms. Miller hit the ground, she heard and felt a crunching sensation in her left knee.

41.    Ms. Miller had previously undergone surgical reconstruction in her left knee for a torn anterior cruciate ligament ("ACL").

42.    At the time Officer Prescott shoved her onto the concrete sidewalk, Ms. Miller was not interfering with any law enforcement activity.

43.    At no point before or after Officer Prescott shoved her was Ms. Miller violating any law or doing anything that would reasonably give rise to any suspicion that she was.

44.    At the moment Officer Prescott shoved her, Ms. Miller was backing up as requested.

45.    Once on the ground, Ms. Miller was shocked and afraid.

46.    As she lay on the pavement, Officer Prescott told Ms. Miller, "You are under arrest, get up."

7

47.    Ms. Miller responded, "I can't get up. My knee is not stable."

48.    Ms. Miller was in visible pain and unable to stand.

49.    Officer Prescott moved toward her as if to lift her.

50.    Instead, after coming closer to Ms. Miller, Officer Prescott turned away and walked off.

51.    Officer Prescott returned to the group of officers around the man.

52.    Officer Prescott did not have any further interactions with Ms. Miller.

53.    Officer Prescott did not offer any medical assistance or check Ms. Miller's condition.

54.    Officer Prescott did not ask Ms. Miller for her name.

55.    There were at least two eyewitnesses to Officer Prescott's actions, one a professional photojournalist and the other an aspiring photojournalist.

56.    While Officer Prescott prepared a police report documenting some of his actions at the U of U Protest, his report did not mention in any way his detention and use of force against Ms. Miller.

57.    This omission violated UPD Policy 300.7(a), which requires officers to document all uses of force.

58.    None of the other UPD officers who were present documented or reported Officer Prescott's use of force against Ms. Miller.

59.    Ms. Miller returned home with extreme pain and visible swelling in her knee. She elevated the leg and applied ice, but her condition worsened.

60.    A later medical evaluation, including an MRI, showed a tear in her previously reconstructed ACL.

8

61. Ms. Miller's healthcare providers told her that if she were to seek surgical treatment, she had the option of either a second ACL graft which would require a tibial osteotomy or a complete knee replacement.

62. Both procedures are invasive and carry long-term consequences, including chronic pain and arthritis.

63. Ms. Miller has suffered, is suffering, and will continue to suffer severe physical and emotional injuries from Officer Prescott's actions.

64. Since the incident, Ms. Miller has experienced ongoing physical pain and limited mobility.

65. Officer Prescott's' use of force against Ms. Miller caused her ACL tear.

66. Ms. Miller now faces either another complicated procedure to try to repair her ACL or a knee replacement surgery.

67. The emotional consequences for Ms. Miller from Officer Prescott's actions against her are also significant.

68. The actions of Officer Prescott, however, have caused and will continue to cause Ms. Miller fear and anxiety in response to law enforcement, particularly at protests and other large public gatherings.

69. Moreover, Ms. Miller will have to contend with the psychologically upsetting reality that her body will never work the same again.

70. Ms. Miller, who is under 30 years old, now faces a lifetime of physical limitations and emotional strain.

71. These physical limitations and difficulties include everyday activities like going up or down the stairs.

72.     Officer Prescott's detention and use of force against Ms. Miller was excessive, unjustified, and unconstitutional.

73.     Officer Prescott was motivated to detain and use force against Ms. Miller because she was documenting police conduct.

74.     Officer Prescott's actions support an award of exemplary damages against him.

75.     Ms. Miller brings this action to vindicate her constitutional rights as a journalist and citizen.

76.     Ms. Miller has retained experienced civil rights counsel to pursue an action arising out of April 29, 2024, events.

## FIRST CLAIM FOR RELIEF
*First Amendment Retaliation, Section 1983*

77.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

78.     At all times relevant hereto, Plaintiff was engaged in protected First Amendment activity of recording the actions of law enforcement officers, including Officer Prescott.

79.     Officer Prescott's actions of shoving Plaintiff to the ground and causing damage to her knee would chill a person of ordinary firmness from continuing to film those activities.

80.     Officer Prescott was motivated to take the actions he took against Plaintiff because of her protected activity of recording him and his colleagues' activities in public.

81.     At all times relevant hereto and in performance of the acts set forth herein, Defendant Prescott acted under color of state law.

82.     At all times relevant hereto, Defendant Prescott actively, knowingly, and personally caused the violation of Plaintiff's constitutional rights as described above.

83.     Officer Prescott's actions were malicious, oppressive, or carried out with reckless disregard for Plaintiff's rights as a journalist.

84.     Officer Prescott is liable for the above-described constitutional violations under 42 U.S.C. § 1983, and his actions meet the standard for exemplary damages.

## SECOND CLAIM FOR RELIEF
*Constitutional Violations under the Fourth and Fourteenth Amendments*

85.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

86.     At all times relevant hereto, Plaintiff had a clearly established right under the Fourth Amendment to be free from excessive force and unlawful seizure by law enforcement.

87.     Defendant Prescott, acting under color of law, unlawfully detained Plaintiff and used objectively unreasonable force against Plaintiff and caused the constitutional violations described herein.

88.     Defendant Prescott's use of force and seizure were not supported by and were objectively unreasonable under clearly established law.

89.     Any reasonable officer was on notice that his actions were clearly established violations of Plaintiff's constitutionally protected rights.

90.     Defendant Prescott's actions were malicious, reckless, and undertaken in willful disregard of Plaintiff's rights.

91.     Defendant is liable for the above-described constitutional violations under 42 U.S.C. § 1983, and his actions warrant exemplary damages.

## THIRD CLAIM FOR RELIEF
*Violations of Article I, Sections 9 and 15 of the Utah Constitution*

92.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

93.     At all times relevant hereto, Plaintiff had a clearly established right under Article 1, Section 9 of the Utah Constitution to be free from excessive rigor in her interactions with law enforcement. Officer Prescott's actions described herein flagrantly violated that right with respect to Plaintiff.

94.     At all times relevant hereto, Plaintiff had a clearly established right under Article 1, Section 15 of the Utah Constitution to be free from abridgements or restraints on the freedom of the press. Officer Prescott's actions described herein flagrantly violated that right with respect to Plaintiff.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues for which a jury is permitted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award:

1.     Compensatory damages as provided under applicable law and in an amount to be proven at trial for physical injuries, emotional distress, medical expenses, and lost earnings;

2.     Damages under the Utah Constitution for violations of Plaintiff's rights to press freedom, speech, and personal security;

3.     Punitive damages at an amount to be proven at trial;

4.     Declaratory judgment that Defendants' conduct violated Plaintiff's constitutional rights;

5.      Attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988 and as

provided under applicable Utah law;

6.      Costs as provided under applicable law;

7.      Pre- and post-judgment interest as provided under applicable law; and

8.      Other declaratory, injunctive, or equitable relief as deemed appropriate.

DATED this 13th day of November, 2025.

CHRISTENSEN & JENSEN, P.C.

/s/ *John M. Mejía*
John M. Mejía
Anna P. Christiansen

*Attorneys for Plaintiff*

Plaintiff's Address:
c/o CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111